# United States Court of Appeals
## For the First Circuit

No. 01-1669

UNITED STATES OF AMERICA,

Appellee,

v.

CLYDE TSE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

Robert L. Sheketoff for appellant.

Brian J. Leske, Assistant U.S. Attorney, with whom Michael J. Sullivan, U.S. Attorney, was on brief, for appellee.

July 21, 2004

**LIPEZ, Circuit Judge**.  Defendant Clyde Tse was convicted of distributing cocaine in violation of 21 U.S.C. § 841(a)(1).  In evaluating one of his claims on appeal relating to a limitation on the cross-examination of the government's principal witness, we must address the important differences in analysis between admitting a prior conviction to impeach a defendant's testimony and admitting such a conviction to impeach the testimony of a government witness.  We must also address Tse's challenges to the admission of evidence of a subsequent drug transaction, the adequacy of the district court's limiting instructions about that transaction, two additional limitations on his ability to impeach the testimony of the principal government witness, and the admission of allegedly prejudicial testimony by that witness.  After full consideration of these issues, we affirm.

## I.

On November 24, 1998, agents of the Drug Enforcement Agency (DEA) attempted to record a drug transaction between Tse and a cooperating witness, Stephen Williams.  The DEA agents outfitted Williams with an audio transmitter called a "kel." The device allowed the agents to listen to and record Williams's conversations, but did not allow them to communicate with Williams.  After searching Williams and his car to ensure that he did not have any drugs or cash, the agents gave him $450 and instructed him to purchase crack cocaine from Tse.

At approximately 6:30 P.M., Williams drove to Tse's residence in Mattapan, Massachusetts. The DEA recorded the ensuing conversation in which Williams told Tse that he had only $450 and that he wanted to buy a half ounce of crack cocaine for that amount. Tse told Williams to return in ten minutes. Williams left Tse's residence and again met with the DEA agents. They instructed him to return to Tse's house to make the drug purchase. At approximately 7:10 P.M. Williams returned to Tse's house where Tse was on the phone, apparently receiving directions to a nearby location. After the phone call, Tse told Williams "we're on," and said that they needed to travel "just around the corner." Tse and Williams left the house and entered Williams's car.

As Williams and Tse drove off, the DEA agents lost the signal from Williams's kel transmitter. Despite their attempts to follow Williams, the agents were not able to record any other conversations between Williams and Tse that evening. However, shortly after Williams and Tse drove off, a member of the DEA surveillance team saw Williams's car parked on a nearby street, only a few blocks from Tse's residence. At least one person was sitting in the car.

At trial, Williams testified that he and Tse drove to a house only a few minutes away. Williams remained in the car while Tse spoke with a man in the doorway and entered the building. According to Williams, Tse returned several minutes later and gave

-3-

a bag of crack cocaine to Williams. Williams and Tse then drove back to Tse's house, where Tse gave Williams a scrap of paper with Tse's pager number written on it.

After Williams dropped Tse off at his residence, he met with the DEA agents and handed over the drugs and the scrap of paper on which Tse had written his pager number. DEA laboratory tests confirmed that the drugs that Tse had allegedly supplied to Williams included 11.2 grams of crack cocaine.

On February 2, 1999, Williams again participated in a DEA operation targeting Tse. He used the pager number that Tse had given him after the previous transaction to contact Tse. In a recorded call, Williams and Tse spoke in a mutually understood code about a drug transaction. Tse agreed to sell 62 grams of cocaine to Williams for $1,800. Williams was again outfitted with a kel transmitter, and DEA agents followed Williams to the meeting place with Tse. When Tse arrived, he provided Williams with powder cocaine. This time, the DEA agents were able to record the entire transaction.

On September 27, 2000, a grand jury charged Tse with two counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1). Count one alleged that Tse had distributed crack cocaine during the November 24 transaction; count two alleged that Tse had distributed powder cocaine during the February 2

transaction.  On December 12, 2000, Tse pled guilty to count two and proceeded to a jury trial on count one.

Because the DEA agents had been unable to record the November 24 transaction, the government relied heavily on Williams's testimony to describe the events of that evening. Williams was not an ideal witness, and Tse's primary strategy was to discredit Williams's testimony.  Through both direct and cross-examination, the jury heard, <u>inter alia</u>, that Williams had used and sold drugs in the past, had been convicted of at least one crime, had made inaccurate statements to the grand jury about his prior involvement with drugs,[1] had received substantial compensation for his work as a DEA informant, and had purchased a new car shortly after receiving payments from the DEA.

The trial lasted four days, ending on December 15, 2000. Despite Tse's aggressive impeachment of Williams's testimony, the jury found Tse guilty of distributing a controlled substance during the November 24 transaction.  On April 25, 2001, the district court sentenced Tse to 120 months in prison on each count (as noted, he had pled guilty to count two of the indictment) to be served concurrently.

---

[1]Before the grand jury, Williams testified that he had never sold crack cocaine and that he had used marijuana only once.  On cross-examination Williams admitted that those statements were not correct and that he had sold crack cocaine and had used marijuana on several occasions.

On appeal, Tse claims that the district court made a number of errors.  First, Tse argues that the district court erred in admitting evidence of the February transaction.  Second, Tse argues that the court gave inadequate limiting instructions to the jury about the proper use of evidence of the February transaction.  Third, he argues that the district court erred in limiting his cross-examination of Williams by preventing him from (1) impeaching Williams's credibility by introducing evidence that Williams had been convicted of assault and battery against a police officer, (2) introducing evidence that charges against Williams stemming from a traffic stop were dismissed after Williams began cooperating with the DEA, and (3) refreshing Williams's memory with an employment application he had filled out several years earlier.  Finally, Tse argues that the district court impermissibly allowed the government to solicit prejudicial evidence from Williams during redirect examination.  We address each of Tse's arguments in turn, relating the relevant details of the trial where appropriate.

## II.

At trial, the government sought to introduce evidence of the February transaction, arguing that such evidence had "special relevance" under Federal Rule of Evidence 404(b).[2]  The government

---

[2]Federal Rule of Evidence 404(b) states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other

-6-

offered several theories of admissibility. First, it argued that the February transaction demonstrated Tse's intent in meeting with Williams on November 24. Because Tse had argued in his opening statement that his November meeting with Williams did not involve a drug transaction, the government reasoned that evidence of Tse's intent was at issue in the case.[3] Second, the government argued that the February evidence was admissible to boost Williams's credibility since the February transaction was similar to Williams's description of the November transaction. Third, the government argued that tape of the February transaction showed that Tse had sold drugs to Williams on previous occasions because, when Williams called to arrange the February deal, both he and Tse began speaking about the transaction in a mutually understood code without an initial discussion of whether Tse could procure drugs. Finally, the government argued that the February transaction demonstrated a "criminal association" between Tse and Williams, creating an inference that, if their purpose for meeting on February 2 was to carry out a drug transaction, their purpose for

---

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . . ."

[3]At trial, Tse did not testify and did not offer any other witnesses or evidence in his defense. Rather, during his opening statement, Tse's counsel claimed that Tse's association with Williams was innocent, stating that Tse "didn't sell crack to Stephen Williams, couldn't sell crack to Stephen Williams on November 24, 1998, or any other day."

meeting on November 24 was likely to carry out a similar transaction.

Tse objected that evidence of the February transaction had no special relevance because he had admitted that he and Williams were together on November 24 during the time of the alleged drug transaction. He argued that there was therefore no need to admit evidence to demonstrate the relationship between Williams and Tse. Rather, evidence of the February transaction could only be used by the jury to draw a forbidden propensity inference: if Tse had sold drugs to Williams on February 2, he likely sold drugs to Williams on November 24.

After hearing arguments on this issue, the district court admitted the evidence, ruling that the evidence had "special relevance" within the scope of Rule 404(b) because it demonstrated that Tse and Williams had a "criminal association" in February.[4] The court did not specify the probative value of this "criminal association," stating only that the criminal association was "one that the government may have evidence of." The court also ruled that the probative value of the February transaction was not substantially outweighed by its prejudicial effect. Thus, the

---

[4]While the court admitted evidence supporting the prosecution's claim that Tse had sold cocaine to Williams in February, neither the court nor the prosecution told the jury that Tse had already pled guilty to charges stemming from the February transaction.

court ruled that evidence of the February transaction was not barred by Rule 403.[5]  The defense objected to these rulings.

We review for abuse of discretion the district court's determination that prior bad act evidence was admissible pursuant to Rules 404(b) and 403.  See United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000).  A district court may admit evidence of a defendant's other bad acts only if that evidence meets the requirements of both Rule 404(b) and Rule 403.  To be admissible under Rule 404(b), "the evidence must have 'special relevance' to an issue in the case such as intent or knowledge, and must not include 'bad character or propensity as a necessary link in the inferential chain.'" Varoudakis, 233 F.3d at 118 (quoting United States v. Frankenhauser, 80 F.3d 641, 648 (1st Cir. 1996)); see also United States v. Escobar-De Jesus, 187 F.3d 148, 169 (1st Cir. 1999) (permitting the introduction of bad act evidence "if the evidence is relevant for purposes other than proof of a defendant's bad character or criminal propensity").  Second, pursuant to Rule 403, the probative value of the bad act evidence must not be "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; see also Varoudakis, 233 F.3d at 118.  A trial court

_____

[5]Federal Rule of Evidence 403 states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

-9-

may admit evidence of other bad acts indicating a criminal association even when the evidence describes an event that occurred later than the charged crime. United States v. Procopio, 88 F.3d 21, 29 (1st Cir. 1996) ("A later criminal association increases the likelihood of an earlier one--which is all that 'relevance' requires . . . and numerous cases permit such reasoning from a later event or condition to an earlier one.")(citations omitted).

In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators. See Procopio, 88 F.3d at 29. Evidence of a criminal association among the alleged conspirators can be probative in several respects. It can demonstrate the background of a relationship, a collaboration among several parties, or a mutual trust between conspirators. See Varoudakis, 233 F.3d at 121 (admitting evidence of a prior bad act to demonstrate mutual trust between alleged conspirators); Escobar-De Jesus, 187 F.3d at 169 ("[E]vidence of other bad acts . . . can be admitted to explain the background, formation and development of the illegal relationship . . . and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust . . . .")(citations omitted); Procopio, 88 F.3d at 29 (stating that evidence of a subsequent criminal association "was helpful to the government's claim that the two men had collaborated" in a prior robbery). It

can also rebut a defendant's claim that his association with the alleged conspirators was innocent. See United States v. Rodriguez, 215 F.3d 110, 119 (1st Cir. 2000) ("In particular, the government's evidence must overcome the possibility that a particular defendant's association with criminal co-conspirators was wholly innocent or that, if he was with them at the scene of criminal activity, he was 'merely present,' without guilty knowledge or intent.").

Tse argues that, because he was not charged with conspiracy, his collaboration with other parties is not at issue. We disagree. Tse's defense--that he was with Williams on November 24 but that he did not participate in a drug transaction on that day--makes Tse's relationship with Williams "directly in issue and material to the case" and thus permits the court to admit evidence of a subsequent criminal association. Escobar-De Jesus, 187 F.3d at 169. See also Rodriguez, 215 F.3d at 119 (holding admissible evidence of another of defendant's drug ventures with the same participants to rebut defendant's claim that, on the occasion of the charged crime, he was an innocent bystander); United States v. Lopez, 340 F.3d 169, 174 (3d Cir. 2003) (following decisions "upholding the admission of evidence of prior drug involvement for the purpose of rebutting defense claims of innocent association"); United States v. Ruiz-Estrada, 312 F.3d 398, 403 (8th Cir. 2002) (admitting other act evidence to rebut defendant's defense that he

-11-

was "merely present" in an apartment that contained evidence of a drug conspiracy).

In this case, the court properly admitted evidence of the February transaction to refute Tse's claim that his meeting with Williams in November was innocent. Evidence of the February transaction between Williams and Tse, including their use of coded language, indicated that they had collaborated on similar transactions in the past and that they both understood the nature of their meeting. Although the government did not have to demonstrate an agreement, as it would have in a conspiracy case, this evidence was still critical to demonstrate the nature of Tse's association with Williams, which helped to refute Tse's claim that their November meeting was innocent.

Evidence of other bad acts always carries with it a danger of a forbidden propensity inference. But Rule 404(b) requires only that there be some other permissible reason, subject to the requirements of Rule 403, to admit the evidence. Here, evidence of the February transaction refuted Tse's claim that his association with Williams was innocent. Thus, the district court properly admitted the evidence under Rule 404(b).[6]

---

[6]After finding that evidence of the February transaction was admissible under Rule 404(b), the district court also found that it was admissible under the balancing test of Rule 403. On appeal, Tse has not offered any argument challenging the district court's ruling on the admissibility of the February evidence under Rule 403.

## III.

After ruling on the admissibility of the February evidence, the district court gave the following limiting instruction to the jury:

> The defendant is charged in this indictment with an offense said to have occurred on November 24, 1998. The government is offering evidence of another transaction in February of 1999 [that] the defendant is not charged with in this case. The evidence is offered as it may bear on your assessment of whether the government's case regarding the November incident is sufficient or not, including whether the government has established that the defendant knowingly and intentionally participated in a drug transaction on November 24, as alleged in the indictment. The evidence of the other incident may or may not, in your judgment, support a conclusion that he was a participant in such a transaction in November. The February '99 incident, if it occurred, if you find that it occurred, which is the first question, and if you do, you may consider it for that purpose if it bears on the defendant's knowing and intentional participation in a similar transaction in November. You may not consider it as evidence if it were that of the defendant's character or general propensity to be involved in criminal activity. This is not evidence about the defendant or his instincts or propensity. It is evidence that may or may not, as you judge appropriate, be used in considering what inferences you might make about the evidence concerning the November transaction.

Following this instruction, the government solicited testimony from one of the DEA agents who monitored the February transaction, and played an audio tape of that transaction.

-13-

Tse objected that the court's limiting instruction did not state that the jury "can only use [evidence of the February transaction] for the very specific purpose that the government has suggested here, which is that there is some kind of relationship between [Williams and Tse]." The court responded that "I don't want to be arguing the government's case, so I don't want to suggest there's a connection." The court then noted Tse's objection.

On appeal, Tse challenges the adequacy of the district court's limiting instructions to the jury. Upon request by the defendant, a district court must instruct the jury on the permissible use of other bad act evidence admitted against the defendant. Fed. R. Evid. 105; Huddleston v. United States, 485 U.S. 681, 691-92 (1988) ("[T]he trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted."). The First Circuit pattern jury instructions explicitly state (1) that the bad act evidence cannot be used to infer guilt based on the defendant's character and (2) that the other act evidence may be used only for specific enumerated purposes.[7] See Pattern Crim. Jury Instr. 1st Cir. § 2.05 (1998).

---

[7]The pattern instruction reads:

> You have heard [will hear] evidence that
> [defendant] previously committed acts similar
> to those charged in this case. You may not

However, "[b]y their terms, those instructions are precatory, not mandatory. A district court possesses wide discretion to instruct in language that it deems most likely to ensure effective communication with jurors." United States v. Gomez, 255 F.3d 31, 39 n.7 (1st Cir. 2001). See also Pattern Crim. Jury Instr. 1st

use this evidence to infer that, because of his/her character, [defendant] carried out the acts charged in this case. You may consider this evidence only for the limited purpose of deciding:

(1) Whether [defendant] had the state of mind or intent necessary to commit the crime charged in the indictment;

or

(2) Whether [defendant] had motive or the opportunity to commit the acts charged in the indictment;

or

(3) Whether [defendant] acted according to a plan or in preparation for commission of a crime;

or

(4) Whether [defendant] committed the acts he/she is on trial for by accident or mistake.

Remember, this is the only purpose for which you may consider evidence of [defendant's] prior similar acts. Even if you find that [defendant] may have committed similar acts in the past, this is not to be considered as evidence of character to support an inference that [defendant] committed the acts charged in this case.

Pattern Crim. Jury Instr. 1st Cir. § 2.05 (1998).

Cir., Preface (1998) ("Although we believe that the pattern instructions . . . will be helpful in crafting a jury charge in a particular case, it bears emphasis that no district judge is required to use the pattern instructions, and that the Court of Appeals has not in any way approved the use of a particular instruction."); United States v. Palmer, 203 F.3d 55, 59 (1st Cir. 2000) ("The district court has considerable leeway as to the phrasing and timing of a curative instruction."). Because Tse objected below to the formulation of the instruction, "our review is for abuse of discretion 'to determine whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.'" United States v. Ranney, 298 F.3d 74, 79 (1st Cir. 2002) (citations omitted); see also United States v. Picciandra, 788 F.2d 39, 46 (1st Cir. 1986) ("We review the propriety of instructions to a jury under the abuse of discretion standard.")

The court's instruction adequately limited the jury's consideration of the February evidence. First, the court specifically instructed that "[y]ou may not consider it as evidence if it were that of the defendant's character or general propensity to be involved in criminal activity. This is not evidence about the defendant or his instincts or propensity." Second, the court identified the proper use for evidence of the February transaction: "The evidence of the other incident may or may not, in your

-16-

judgment, support a conclusion that [Tse] was a participant in such a transaction in November. . . . [Y]ou may consider [the February evidence] for that purpose if it bears on the defendant's knowing and intentional participation in a similar transaction in November."  Thus, the court instructed the jury that it could not use evidence of the February transaction to make a propensity inference and that it should use the evidence only to determine Tse's knowledge and intent at the time of the alleged November transaction.[8]  We find no abuse of discretion in the court's instruction.

At the end of the trial, prior to jury deliberations, the court again offered a limiting instruction regarding evidence of the February transaction:

> You may not consider evidence of the February 1999 transaction as indicating that the defendant is of bad character and therefore someone who had an inclination or propensity to commit the crime that's charged.  A person may not be convicted of having a bad character or inclination.  He may only be convicted if you are satisfied beyond a reasonable doubt that he committed the offense as alleged in the indictment.

---

[8]While the court admitted evidence of the February transaction as probative of Tse's "criminal association" with Williams, it instructed the jury to use the February evidence only to determine Tse's "knowing and intentional participation" in the November transaction.  Tse has not argued that this difference rendered the instruction inadequate.  Moreover, both of these rationales are variations on the same theme: that Tse's relationship with Williams was not innocent.  Thus, it is not important to our analysis that the judge spoke in his instruction about "knowing and intentional participation" rather than about a "criminal association."

-17-

Although Tse objected to some portions of the instructions given prior to jury deliberation, he did not object to the portion of those instructions concerning evidence of the February transaction. He raises an objection to this instruction for the first time on appeal.

"When an objection to a jury instruction is forfeited, we apply the plain error standard." Connelly v. Hyundai Motor Corp., 351 F.3d 535, 545 (1st Cir. 2003). Relief under the plain error standard requires (1) an error, (2) that is plain, (3) that is likely to alter the outcome, and (4) that is sufficiently fundamental to threaten the fairness, integrity, or public reputation of judicial proceedings. Id.

The court's instruction on other bad act evidence at the end of the trial only told the jury that it must not use evidence of the February transaction to draw a propensity inference. Unlike the earlier instruction just before the evidence was admitted, this instruction did not tell the jury the limited purpose for which it should use that evidence. While it would have been preferable for the trial judge to use the more complete instruction again, the plain error standard cannot be met. The jury had previously been given a full instruction on the proper use of the February evidence. We cannot conclude that the failure to specify proper use of the February evidence during the second instruction altered the outcome of this trial in any way.

"Confrontation Clause challenges are reviewed <u>de novo</u> in order to verify that the trial court afforded the defendant a reasonable opportunity to impeach adverse witnesses. When that constitutional threshold is crossed, we examine the trial court's restrictions on the manner and extent of cross-examination for abuse of discretion." <u>United States</u> v. <u>Perez-Ruiz</u>, 353 F.3d 1, 11 (1st Cir. 2003).

Tse argues that the district court impermissibly limited his cross-examination of Williams on three occasions. First, the court did not allow Tse to impeach Williams with Williams's previous conviction for assault and battery against a police officer. Second, the court did not permit Tse to offer evidence of charges against Williams, later dismissed, stemming from a traffic stop on September 6, 1998. Tse sought to use these charges to demonstrate that Williams had a motive to cooperate with the government. Finally, the court did not allow Tse to attack Williams's credibility by demonstrating that Williams had made false statements on an employment application. We address each argument in turn.

## A. Conviction for Assault and Battery Against a Police Officer

Tse attempted to impeach Williams's credibility by introducing evidence of Williams's prior conviction for assault and battery against a police officer (ABPO). At first, the district

court agreed that the evidence was admissible pursuant to Federal Rule of Evidence 609(a)(1).[9] However, at a sidebar conference, the court addressed a related matter: Tse's motion to exclude Tse's own convictions, one of which was for ABPO, if Tse should choose to testify. The court viewed the admissibility of Williams's conviction as closely related to the admissibility of Tse's conviction, stating that "[a]lthough it's not an identical analysis, it's close enough that it may be that . . . if it's allowed in this case, it would be allowed in the other as well." The court later reiterated:

> And if a particular offense is admitted as impeachment for the witness under [Rule 609] (a)(1), then that may -- consistency may result in a similar ruling with respect to the

---

[9]Fed. R. Evid. 609 states in relevant part:

> (a) **General Rule.** For the purpose of attacking the credibility of a witness,
>> (1) evidence that a witness other than the accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; . . . .

In Massachusetts, ABPO is punishable by up to two and one half years in prison. Mass. Gen. Laws ch. 265, § 13D. Thus, it qualifies for admission under Rule 609 as a "crime punishable by . . . imprisonment in excess of one year under the law under which the witness was convicted."

-20-

> defendant, although I note there is a distinction in (a)(1) between an accused and someone who is not an accused. But since they both -- I don't -- I know the language makes a distinction. I'm not sure it -- the distinction -- pertains to the [Rule] 403 aspect of it.

After hearing counsel's arguments about whether any of Tse's convictions should be admitted if he were to testify, the court again compared Williams's ABPO conviction to Tse's ABPO conviction, stating that "if it's probative enough in one case, it has to be probative enough in the other, it seems to me. . . . There is a difference [in standards of admissibility], but I'm not sure it's a pertinent difference with respect to this." The court added: "I don't know that there's, in fact, a different standard, except that maybe it's a caution to make sure that it has probative value . . . ." Finally, the court determined that it would "keep them both out," ruling that neither Williams's ABPO conviction nor Tse's ABPO conviction was admissible. Tse objected and now argues on appeal that the court improperly excluded Williams's ABPO conviction.[10]

Rule 609 provides different standards for admitting prior convictions to impeach the accused and to impeach witnesses other than the accused. When the witness is the accused, evidence of a prior conviction "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its

_____

[10]Tse does not argue on appeal that the court's ruling deterred him from testifying. He argues only that he should have been allowed to impeach Williams with his prior ABPO conviction.

prejudicial effect to the accused." Fed. R. Evid. 609. When the witness is other than the accused, such evidence "shall be admitted, subject to Rule 403." Id. Rule 403 in turn states that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Fed. R. Evid. 403.

This dual approach is the result of a 1990 amendment to Rule 609. Prior to that amendment, the rule did not explicitly distinguish between the accused and witnesses other than the accused. Rather, a district court could admit prior convictions against any witness if it determined that "the probative value of admitting this evidence outweigh[ed] its prejudicial effect to the defendant." See 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 609App.03[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2004) (stating the language of Rule 609 prior to the 1990 amendment). The language of the rule, explicitly protecting only against prejudice to the defendant in a criminal case, seemingly provided no protection to litigants in civil cases or to prosecution witnesses in criminal cases. See Green v. Bock Laundry Mach. Co., 490 U.S. 504, 509, 527 (1989) (holding that the pre-1990 version of Rule 609 required courts to admit prior convictions against civil litigants regardless of prejudice, and

noting that "impeaching evidence detrimental to the prosecution in a criminal case 'shall be admitted' without any such balancing [of probative value against prejudice]").

The 1990 amendment "[did] not disturb the special balancing test for the criminal defendant who chooses to testify." Fed. R. Evid. 609 advisory committee's notes on 1990 amendment. Rather, the amendment made prior convictions of witnesses other than the accused explicitly subject to the Rule 403 analysis. See id. ("[T]he ordinary balancing test of Rule 403 . . . is appropriate for assessing the admissibility of prior convictions for impeachment of any witness other than a criminal defendant.").

This change may not have been aimed explicitly at providing protection for witnesses other than the accused in a criminal trial. See H. Richard Uviller, Essay: Credence, Character, and the Rules of Evidence: Seeing Through the Liar's Tale, 42 Duke L.J. 776, 798 (1993) ("A solid argument might be made that the entire purpose to the amendment to Rule 609(a) was to clarify its application to civil cases . . . ."). Nevertheless, "whether intended or not, . . . the amendment of Rule 609(a) has had a dramatic impact on the impeachment of prosecution witnesses in criminal cases." Id. at 798. "[P]rosecution witnesses should be shielded from impeachment by prior conviction if revealing the prior conviction would result in prejudice to the prosecution." Id. at 801 (emphasis in original). Indeed, the Advisory Committee

Notes indicate that the drafters were aware of the amendment's impact on government witnesses:

> Some courts have read Rule 609(a) as giving the government no protection for its witnesses. This approach is . . . rejected by the amendment. There are cases in which impeachment of government witnesses with prior convictions that have little, if anything, to do with credibility may result in unfair prejudice to the government's interest in a fair trial and unnecessary embarrassment to a witness.

Fed. R. Evid. 609 advisory committee's notes on 1990 amendment (citations omitted). Thus, there is no doubt that we must apply a Rule 403 analysis to prior convictions of government witnesses in a criminal prosecution.[11]

Although Rule 609 sets out two different evidentiary standards for admitting prior convictions for impeachment, it does not make clear whether the court's application of each standard requires a substantively different analysis. Some commentators have suggested that Rule 609 provides greater protection to the accused than it does to other witnesses in the use of prior convictions for impeachment. See Weinstein, supra, § 609.02 ("If

---

[11]Separate from admitting prior convictions to impeach a government witness under Rule 609, "the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness." United States v. Abel, 469 U.S. 45, 50 (1984). "In any case in which the trial court believes that confrontation rights require admission of impeachment evidence, obviously the Constitution would take precedence over [Rule 609]." Fed. R. Evid. 609 advisory committee's notes on 1990 amendment.

the witness to be impeached is the accused in a criminal case, the rule establishes a more stringent discretionary standard [for admissibility]."). Others are skeptical that the difference between the two balancing tests is sufficiently different to draw a practical distinction in the evidentiary showing required for admission of a prior conviction. See Uviller, supra, at 800 (suggesting that "the practical possibility of such fine calibration of the danger of prejudice is dubious."). Although "the nature of the distinction is elusive," Uviller, supra, at 799, the drafting of the rule suggests that the distinction is intentional. If the drafters had wanted to apply the same evidentiary test to all prior convictions, they could easily have stated a universal rule instead of differentiating between the accused and all other witnesses. We therefore examine closely the two standards to determine the precise nature of their differences.

To describe accurately the distinctions in Rule 609(a)(1), however, we must first unravel a linguistic oddity in its language. With respect to a witness other than the accused, the rule provides that a conviction "shall be admitted, subject to Rule 403." The instruction that convictions "shall be admitted" indicates that Rule 609 is a rule of inclusion; any conviction meeting Rule 609's requirements will be admitted. However, the reference to Rule 403 complicates the analysis. That rule, applicable when a party objects to otherwise relevant evidence,

provides that evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Thus, by its language, Rule 403 is a rule of exclusion. These conflicting formulations of inclusion in rule 609 and exclusion in Rule 403 raise some uncertainty about whether the impeaching party (here Tse, who sought to impeach Williams with his prior conviction) bears the burden of demonstrating the superior probative value of the prior convictions to justify admission of the evidence, or whether the impeached party (here the government, which sought to avoid the impeachment of Williams with his prior conviction) bears the burden of demonstrating the danger of unfair prejudice to justify exclusion of the evidence. See Uviller, supra, at 799-800 (noting this distinction).

The advisory committee notes offer some clarification regarding the use of a prior conviction to impeach government witnesses.[12] The notes state that the "[Rule 403] balancing test protects . . . the government in criminal cases" and that "[o]nly when the government is able to point to a real danger of prejudice that is sufficient to outweigh substantially the probative value of

_____

[12]Although Rule 609 distinguishes between "an accused" and any "witness other than an accused" (thereby including witnesses in civil cases), the advisory committee notes also discuss specifically a "government witness" in a criminal case. The distinction at issue in this case is between "an accused" and a "government witness," and we therefore focus the remainder of our discussion on that distinction, drawing from the comments in the advisory committee notes that are specific to the attempt to impeach a government witness.

the conviction for impeachment purposes will the conviction be excluded." Fed. R. Evid. 609 advisory committee's notes on 1990 amendment. Therefore, although the proponent of the admission of the evidence of a prior conviction is the accused who seeks to impeach the government witness, the government bears the burden of protecting its witnesses from such impeachment by demonstrating to the court, pursuant to Rule 403's exclusionary rule, that the probative value of the conviction at issue is substantially outweighed by the danger of unfair prejudice, or the other grounds for exclusion noted in Rule 403.[13]

This standard of prejudice differs from the standard of prejudice applicable to the court's consideration of requests by the government to impeach a defendant with prior convictions. The court may exclude a prior conviction of the accused, offered for the purpose of impeachment, if the prejudicial effect of the

_____

[13]These other grounds for exclusion available to government witnesses include "confusion of the issues," "misleading of the jury," and "considerations of undue delay, waste of time or needless presentation of cumulative evidence." Fed. R. Evid. 403. Rule 609 does not explicitly mention these grounds for excluding the prior convictions of an accused. Instead, it refers only to the "prejudicial effect to the accused." "From the imbalance, some might claim that the impeaching convictions might be excluded when offered against a witness other than the accused by operation of the distraction or delay factor, whereas a prior criminal conviction of the defendant will always be efficient." Uviller, supra, at 800. "[S]uch a construction of the distinction between defendant-witnesses and other witnesses would be inconsistent with the policy . . . that a higher standard should protect the testifying defendant in a criminal case against impeachment by prior conviction." Id. at 801. Although the issue noted is an important one, this case does not require us to resolve it.

-27-

conviction merely <u>outweighs</u> its probative value; the court may exclude a conviction of a government witness, offered by the accused for the purpose of impeachment, only if the danger of unfair prejudice from the conviction <u>substantially outweighs</u> its probative value.

In addition, Rule 403 protects government witnesses only against the danger of "unfair prejudice," while Rule 609 protects the accused against any "prejudicial effect." <u>See</u> <u>United States</u> v. <u>Smith</u>, 292 F.3d 90, 99 (1st Cir. 2002) (noting that Rule 403 protects only against unfair prejudice rather than all prejudice); <u>United States</u> v. <u>Rodriguez-Estrada</u>, 877 F.2d 153, 156 (1st Cir. 1989) ("[A]ll evidence is meant to be prejudicial; it is only <u>unfair</u> prejudice which must be avoided."). "Usually, courts use the term 'unfair prejudice' for evidence that invites the jury to render a verdict on an improper emotional basis." <u>Varoudakis</u>, 233 F.3d at 122; <u>see also</u> <u>United States</u> v. <u>Currier</u>, 836 F.2d 11, 18 (1st Cir. 1987) (noting that "unfair prejudice" is prejudice that causes "a jury to base its decision on something other than the established proposition in the case" (quoting 1 <u>Weinstein's Evidence</u> § 403[03], 36-39 (1986))). Thus, while a court must weigh all potential "prejudicial effect" to the defendant when deciding whether to admit a prior conviction of the accused, it must weigh only the kind of prejudice that can be deemed "unfair" when

deciding whether to admit the prior conviction of a government witness.

These distinctions--"substantially outweighs" versus "outweighs," and "unfair prejudice" versus "prejudicial effect"-- support the assertion of the Weinstein treatise that the standard for the admission of prior convictions of the accused is stricter than the standard for the admission of prior convictions of a government witness.  These distinctions also recognize that the potential prejudice to the defendant from the admission of prior convictions is simply not the same as the potential prejudice to a government witness.  In particular, there is a heightened risk that a jury will use evidence of a prior conviction of the accused to draw an impermissible propensity inference:

> [I]n virtually every case in which prior convictions are used to impeach the testifying defendant, the defendant faces a unique risk of prejudice--i.e., the danger that convictions that would be excluded under Fed. R. Evid. 404 will be misused by a jury as propensity evidence despite their introduction solely for impeachment purposes.

Fed. R. Evid. 609 advisory committee's notes on 1990 amendment. See also Uviller, supra, at 802-803 ("[T]he outstanding difference between harm to a defendant and harm to other witnesses is undeniable: A jury might conclude from the testifying defendant's criminal career (despite vociferous instructions from the court to the contrary) that he committed the crime charged because of a demonstrated propensity to engage in criminal conduct.  That kind

-29-

and degree of damage cannot be suffered by the prosecution or its witnesses . . . ."). Moreover, revelations of past convictions may inflame the jury. See, e.g., United States v. Beahm, 664 F.2d 414, 419 (4th Cir. 1981) (excluding evidence of a prior conviction in part because "it was likely to inflame the jury and thus prejudice the defendant").

In contrast, the prior convictions of a government witness are unlikely to inflame the jury or invite a propensity inference:

> The probability that prior convictions of an ordinary government witness will be unduly prejudicial is low in most criminal cases. Since the behavior of the witness is not the issue in dispute in most cases, there is little chance that the trier of fact will misuse the convictions offered as impeachment evidence as propensity evidence.

Fed. R. Evid. 609 advisory committee's notes on 1990 amendment. Rather, the prior convictions of government witnesses are more likely to cause "unfair prejudice to the government's interest in a fair trial and unnecessary embarrassment to [the] witness." Id. While these are important concerns, see United States v. Orlando-Figueroa, 229 F.3d 33, 46 (1st Cir. 2000) (affirming district court's decision to exclude prior crime of government witness involving dishonesty where defense was able to impeach the witness with evidence of more recent dishonest acts), "trial courts will be skeptical when the government objects to impeachment of its

witnesses with prior convictions." Fed. R. Evid. 609 advisory committee's notes on 1990 amendment.

We summarize. With respect to the use of prior convictions for impeachment, Rule 609 distinguishes between the accused and mere witnesses. A court may admit a conviction of the accused only if the probative value "outweighs its prejudicial effect to the accused." By contrast, a court shall admit a conviction of a government witness unless that conviction should be excluded under Rule 403. The burden under Rule 403 is on the party opposing admission, who must show that the probative value "is substantially outweighed by the danger of unfair prejudice." In this case, in considering the admission of a prior conviction of Tse and a prior conviction of Williams, the government's principal witness, the district court appeared to apply a uniform standard of exclusion. If so, the failure to apply the different standards for exclusion was an error of law.[14]

However, any such error was harmless. "[A] non-constitutional evidentiary error will be treated as harmless if it is highly probable that the error did not contribute to the verdict." United States v. Rose, 104 F.3d 1408, 1414 (1st Cir.

---

[14]Moreover, explicit rulings on these separate evidentiary issues are important to facilitate review on appeal. See United States v. Oakes, 565 F.2d 170, 173 n.12 (1st Cir. 1977) ("[T]he district court's explicit statements in the record revealing its knowledge of Rule 609(a) and the basis for its resolution of the balancing required by it are most helpful to this court in carrying out our review.").

1997). The government bears the burden of persuasion to show that the error is harmless. Id. "In conducting a harmless error analysis, the court 'must mull the ruling in context, giving due weight to the totality of the circumstances'" and avoid "'unnecessarily interven[ing] in a process that--although imperfect--adequately protected defendant's rights.'" United States v. Wilkerson, 251 F.3d 273, 280 (1st Cir. 2001) (citations omitted).

The excluded evidence of Williams's prior conviction was unmistakably cumulative. Id.; see also Rose, 104 F.3d at 1414. The jury heard evidence that Williams had been convicted of at least one crime; that he had made false statements to the grand jury and on a job application;[15] that he had been paid a significant sum for his work as a DEA informant and had bought a new car soon after the November transaction; that he had not reported his earnings from the DEA on his tax return, despite having been told to do so; and finally, that he had dealt and used illicit drugs in the past. The jury had ample reason to closely scrutinize Williams's credibility in this case. It is highly probable that any error in excluding Williams's ABPO conviction had no impact on the verdict.

---

[15]On cross-examination, Williams admitted stating on an employment application that he had attended Bunker Hill Community College even though he had never enrolled there as a full-time student.

## B. Traffic Stop

As a general matter, a defendant has the right to cross-examine a prosecution witness about matters that might cause the witness to be biased against the defendant. See, e.g., United States v. Barrett, 766 F.2d 609, 614 (1st Cir. 1985) ("[A] defendant has a right to cross-examine an accomplice as to the nature of any agreement he had with the government or any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation."). However, a defendant must lay a proper foundation before evidence of bias is admitted. Bui v. DiPaolo, 170 F.3d 232, 245 (1st Cir. 1999) ("[A] defendant . . . must present a satisfactory foundation for the critical elements on which his hypothesis of bias depends.").

Moreover, once the defendant's Sixth Amendment right to establish bias has been satisfied, the district court has the discretion to limit the scope of the bias inquiry. See Bui, 170 F.3d at 242 ("[T]o the extent that the petitioner is suggesting that a criminal defendant has license to cross-question a prosecution witness concerning every conceivable theory of bias, . . . he is plainly wrong."); Barrett, 766 F.2d at 614 ("[T]he court has the discretion to limit cross-examination once the defendant's Sixth Amendment right to establish the potential bias of the accomplice-witness has been satisfied."). The district court's discretion allows it to exclude evidence of previously dismissed

-33-

criminal charges against the witness.  United States v. Marrero-Ortiz, 160 F.3d 768, 775 (1st Cir. 1998) (finding no abuse of discretion where the district court prohibited the defendant from cross-examining a prosecution witness about a dismissed charge of weapons possession).

Tse laid no foundation for his line of questioning about the traffic stop.  The record does not indicate that charges against Williams were dropped in return for Williams's cooperation with the DEA, and Tse never attempted to offer evidence to this effect.  Indeed, if such an agreement did exist, the government would have been obligated to disclose it along with its disclosures about Williams's compensation for his role in the DEA stings.  See Giglio v. United States, 405 U.S. 150, 154-55 (1972) (holding that failure to disclose impeachment material against a government witness is a violation of due process).  Tse's questioning relied solely on a theory of quid pro quo entirely unsupported by evidence.

Moreover, Tse's right to question Williams about his potential bias in favor of the government was satisfied by other lines of questioning.  Tse established that Williams began working at the Boston Housing Authority--the same organization that employed one of the DEA task force members in the Tse sting operation--after he had testified as a cooperating witness in a previous trial.  He established that Williams had been

intermittently unemployed prior to working for the DEA, and that the DEA had, on certain occasions, helped him pay routine bills and expenses. He further established that Williams had purchased a new car in the fall of 1999, and that he had signed a loan application listing the DEA as his employer and a monthly income of $2,700. Williams's direct examination testimony established that the DEA had paid him $17,000 for his work as an informant. In light of this other evidence of bias, the district court acted well within its discretion in excluding evidence of the traffic stop.

## C. Employment Application

Tse attempted to attack Williams's character for truthfulness by asking Williams about allegedly false statements that Williams had made on an employment application in 1997. Although the court initially ruled that Tse could not question Williams about the application, it agreed to revisit the issue on the next day of trial. When Tse renewed his request the following day, he said he would use the employment application to refresh Williams's memory if Williams could not recall the statements he had made on the application. The government argued that Tse could question Williams about the application but could not use the application to refresh Williams's memory because doing so would be tantamount to using extrinsic evidence to impeach, which is

expressly prohibited by Federal Rule of Evidence 608(b).[16]  The

court agreed with the government, noting that the alleged

misrepresentations at issue in this case were collateral because

they did not relate directly to any matter at issue in the case.

The court allowed Tse to question Williams about the employment

application but prohibited Tse from using the application itself to

refresh Williams's memory.  Tse's counsel asked Williams about only

two statements on the employment application: the dates of his

employment at the Gillette company, and the statement that he had

been a student at Bunker Hill Community College.[17]

District courts have broad discretion to determine

whether to permit the refreshing of a witness's memory. See 28

Wright & Gold, Federal Practice and Procedure: Evidence § 6184

(1993).  In this case, the district court was not obligated to

allow Tse to refresh Williams's memory on the collateral issue of

the content of the employment application.[18]  Tse's questions about

---

[16]Federal Rule of Evidence 608(b) states in relevant part:

"Specific instances of the conduct of a witness, for the purpose of
attacking or supporting the witness' character for truthfulness,
other than conviction of crime as provided in Rule 609, may not be
proved by extrinsic evidence."

[17]These lines of questioning garnered mixed results.  Tse did
not establish whether Williams had made false statements about his
dates of employment at Gillette.  As stated supra at note 15,
however, Williams did admit that he had not been a full time
student at Bunker Hill Community College.

[18]"A matter is considered collateral if 'the matter itself is
not relevant in the litigation to establish a fact of consequence,

the employment application had no conceivable relevance other than to impeach Williams as untruthful.  Using the employment application for this purpose would be a clear violation of Rule 608(b).  The court acted well within its discretion in refusing to allow Tse to refresh Williams's memory on matters entirely collateral to the case.  See United States v. Marino, 277 F.3d 11, 24 (1st Cir. 2002) (excluding testimony contradicting the witness's characterization of his activities as a drug dealer as extrinsic evidence on a collateral matter in violation of Rule 608(b), even though the truthfulness of the witness's testimony was critical to the prosecution's case).

**V.**

During redirect examination the prosecution asked Williams if the DEA had offered him relocation money as part of his compensation for acting as a cooperating witness.  Tse objected.  The court initially sustained the objection, but the prosecution asked to be heard on the matter.  At sidebar, the prosecution explained that, as part of his agreement with the DEA, if Williams lied on the stand during his testimony, the DEA would not provide him with any relocation funds.  Without those funds, Williams would be stuck in Massachusetts even if he feared retaliation from some

---

i.e. not relevant for a purpose other than mere contradiction of the in court testimony of the witness.'"  United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993) (quoting 1 McCormack on Evidence § 45, at 169 (4th ed. 1992)).

of the drug traffickers that he had helped the DEA arrest. Thus, Williams had an incentive to testify truthfully. The court changed its earlier ruling and allowed the prosecution to proceed. The subsequent exchange was as follows:

Q. Mr. Williams, has the DEA offered you money to relocate you?

A. Yes.

Q. Why?

A. Because they didn't think I should be staying in the same place, and sometimes I hear a lot of things that's coming from jail --

DEFENSE COUNSEL: Objection.

A. -- from these guys --

DEFENSE COUNSEL: Objection, Your Honor.

THE COURT: No. Go ahead. Go ahead.

A. -- and little side talks about these guys telling people they're getting me and all of this stuff.

Q. [Defense counsel] asked you a series of questions this morning that you did some DEA control buys from people you knew?

A. Yes.

Q. And you still live in the Boston area?

A. Yes, I do.

Q. Let me ask you Mr. Williams, do you know what happens if you lie to the DEA agents during an undercover operation?  What happens to your status as an informant?

A. I don't know what they do about it, but lying as telling them lies?

Q. Yes.  Do they continue to use you?

DEFENSE COUNSEL: Objection, Your Honor.

THE COURT: Overruled.

Q. Would the DEA continue to use you if they find out that you're lying to them?

A. No, they wouldn't.

Q. Would they continue to pay you money?

A. No, they wouldn't.

Q. Would they continue to offer you relocation benefits?

A. Not that I know about that.

Tse argues that Williams's references to "a lot of things that's coming from jail" and "these guys telling people they're getting me and all of this stuff" were prejudicial because they insinuated that Tse was or had been in prison and that Tse was the source of threats against Williams's life.[19]  This argument is not

_____

[19]Tse also argued before the district court and on appeal that he had not been notified of Williams's relocation agreement and that the disclosure during trial was thus a late disclosure in violation of Giglio v. United States, 405 U.S. 150, 154-55 (1972) (holding that non-disclosure of impeachment evidence may require a new trial where the witness's testimony may have determined guilt or innocence).  The record demonstrates that the prosecution sent

convincing.  Williams's redirect testimony did not suggest that Tse was in prison or that Tse had been the source of death threats against Williams.  During his earlier testimony, Williams made clear that he had participated in several other operations with the DEA, buying drugs both from people that he already knew and from people whom he met only when he attempted to purchase drugs from them at the DEA's direction.  Neither Williams nor the prosecution suggested that Tse was the source of the threats against Williams's life.  Thus, we find no error in the court's decision to allow Tse's redirect testimony.

## VI.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

So ordered.

---

Tse's counsel a letter dated May 30, 2000, stating that "[Williams] has also been promised some form of relocation assistance in the event it becomes necessary due to threats to his person."  Thus, Tse's Giglio claim fails.