FILED
United States Court of Appeals
Tenth Circuit

June 3, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICO YARBROUGH,

Defendant - Appellant.

No. 06-5229

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:06-CR-00050-HDC)**

---

Robert R. Nigh, Jr. (Clark O. Brewster with him on the briefs), Brewster & DeAngelis, Tulsa, Oklahoma, for Defendant-Appellant.

Robert T. Raley, Assistant United States Attorney (David E. O'Meilia, United States Attorney, and Kevin Danielson, Assistant United States Attorney, on the brief), Northern District of Oklahoma, Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **LUCERO**, **MURPHY**, and **HARTZ**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

# I. Introduction

A jury convicted Rico Yarbrough of obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), conspiring to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k), and providing unlawful notice of a search or seizure warrant, in violation of 18 U.S.C. § 2232(c). On appeal, Yarbrough asserts the district court erred in (1) refusing to suppress information obtained through a wiretap, (2) refusing to give the jury an entrapment instruction, (3) refusing to admit at trial evidence of his good character and law-abiding nature, and (4) enhancing his sentence by reference to conduct for which he was acquitted. Although the district court correctly admitted the disputed wiretap evidence and properly refused to instruct the jury on the issue of entrapment, it committed reversible error when it excluded Yarbrough's proffered character evidence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **reverses** Yarbrough's conviction and **remands** to the district court for further proceedings consistent with this opinion.[1]

# II. Background

In 2005, Yarbrough was an officer with the Tulsa Police Department (the "Department") assigned to the organized gang unit. Yarbrough became

---

[1]This court need not reach Yarbrough's sentencing issue because it is possible the issue will not arise again even if the government should choose to retry him.

acquainted with Kejuan Daniels through the Salvation Army Boys and Girls Club. Yarbrough and Daniels co-coached a club football team on which both of their sons played. Yarbrough and Daniels became close friends.

In 2005, the Federal Bureau of Investigation ("FBI") became involved in an investigation of possible information leaks from the records division of the Department. At approximately that same time, the Drug Enforcement Administration ("DEA") initiated an investigation of Daniels. Daniels was suspected of drug distribution, money laundering, and gambling, while using a source inside the Department to help him with his criminal schemes. The FBI and DEA began working together to investigate both Daniels and the possible leaks. The FBI soon learned that Daniels's girlfriend, Deshon Stanley, worked as a records clerk at the Department. The investigators began focusing on Stanley as the source of the information leaks.

A federal grand jury investigating the records leaks at the Department issued subpoenas for the cell phone records of Daniels and Stanley. A review of Daniels's phone records revealed frequent telephone contact between him and Yarbrough. Subsequent wiretap and pen register information revealed a sufficiently strong connection between Yarbrough and Daniels so that agents concluded they needed to know the exact nature of the relationship. Accordingly, the FBI approached Yarbrough's captain, Nick Hondros, about releasing information to Yarbrough about the investigation in the form of a supposed fax

from the Oklahoma City Police Department. The fax indicated Oklahoma City police officers were investigating Daniels and others in connection with a gambling operation and requested any information or assistance the Department could provide. Captain Hondros called Yarbrough into his office, showed him the fax, and instructed him to complete a report detailing his knowledge of Daniels and any investigatory resources that could aid the investigation by the Oklahoma City Police Department. Later that same day, the FBI intercepted a call from Yarbrough to Daniels. Yarbrough told Daniels that he, along with two of his friends, were being investigated on gambling charges.

Three weeks later, Yarbrough met with FBI Agent Matt Lotspeich. The FBI purported to involve Yarbrough deeper in the Daniels investigation for the purpose of discovering the membership and scope of the Daniels-centered conspiracy. During that meeting, Agent Lotspeich showed Yarbrough the FBI investigation file on Daniels and disclosed that the investigation of Daniels involved possible instances of drug dealing and money laundering. Although Agent Lotspeich asked Yarbrough for any information about Daniels that might be helpful, Yarbrough did not disclose to Agent Lotspeich his close friendship with Daniels.

The same day as his meeting with Agent Lotspeich, Yarbrough called Daniels to set up a meeting. That meeting was visually monitored by FBI agents. During the meeting, Daniels made telephone calls to two of his gambling

associates in Oklahoma City. At trial, Yarbrough admitted he had met with Daniels and informed him he was under investigation for connections to illegal gambling, but denied he had done so to impede or obstruct an investigation.

In February of 2006, the FBI obtained a search warrant for Daniels's home in Broken Arrow, Oklahoma. Agent Lotspeich contacted Captain Hondros and asked him to advise Yarbrough about the existence of the warrant. When Yarbrough arrived at Captain Hondros's office, he was informed about the existence of the warrant and instructed to participate in its execution to gather intelligence for the gang unit. As directed by Captain Hondros, Yarbrough called Agent Lotspeich. Immediately after he talked to Agent Lotspeich, Yarbrough called a man by the name of Chris Casey and asked him to warn Daniels about the execution of the warrant. Yarbrough then placed another call to Agent Lotspeich and informed the agent he was uncomfortable participating in the execution of the warrant because he was familiar with Daniels. Yarbrough testified he warned Daniels about the execution of the warrant because he was a close friend, he knew Daniels was not involved in illegal conduct, and he thought Agent Lotspeich was engaged in a fishing expedition.

## III. Discussion

### A. Wiretap Evidence

#### 1. Procedural History

On January 25, 2006, the government filed, in the United States District Court for the Northern District of Oklahoma, an application for the interception of wire communications to and from Yarbrough's cell phone. Chief Judge Claire Eagan granted the application and issued a written order authorizing the wiretap. The order authorized the interception of Yarbrough's conversations involving any of the following offenses: (1) conspiracy to distribute and distribution of controlled substances; (2) unlawful use of a communications facility to aid the commission of a drug felony; (3) schemes or artifices to defraud involving wire communications in interstate commerce; (4) obstruction of state and local law enforcement; (5) obstruction of justice; (6) knowingly receiving stolen property that had crossed a state boundary; (7) illegal gambling businesses; and (8) theft or bribery relating to programs receiving federal funds. The order authorized interception for a period of thirty days, terminating at midnight on February 23, 2006. The agents monitored the wiretap daily from 8:00 a.m. to midnight. FBI Special Agent Dave Clarke, the administrative agent who supervised the surveillance, filed weekly reports with Chief Judge Eagan, who supervised the operation of the interception order pursuant to 18 U.S.C. § 2518(6).

Prior to trial, Yarbrough moved to suppress all evidence obtained by the government through the wiretap. Yarbrough argued, *inter alia*, that all wiretap evidence should be suppressed because the government failed to minimize its interception of calls unrelated to the investigation. The district court rejected Yarbrough's contention, concluding as follows:

> The Court finds . . . that the government has established a prima facie case that the agents conducted reasonable minimization of non-pertinent calls. The evidence established, [and] the Court so finds[,] that the monitoring agents were provided a verbal briefing by [an Assistant United States Attorney] and detailed written Minimization Instructions that outlined the minimization requirements. All monitoring agents were required to read the instructions. Agent Clark was the administrative agent who supervised the surveillance and filed weekly reports to the supervising judge. All four weeks of the surveillance [were] judicially supervised by the authorizing judge. The statute permits a district judge, once a wiretap has been authorized, to continue supervising the operation of the interception by requiring reports from the government. Where the authorizing judge has required and reviewed such reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted. . . . The Court also finds significant that of the 361 calls monitored, 277 of the calls were less than two minutes, and 218 calls were less than one minute. This establishes that only 84 calls were over two minutes and of that number, six of those calls were pertinent. The Court finds that the evidence supports the government's claim that 25.6 percent of the calls subject to minimization were minimized and that this percentage is sufficient to support a finding of reasonable minimization under the facts and circumstances of this case. The fact that the agents only intercepted 361 calls over a period of thirty days, and that no calls were intercepted after midnight or before 8:00 a.m. is also evidence of reasonable minimization.

*United States v. Yarbrough*, No. 06-CR-50, at 5-6 (N.D. Okla. Aug. 18, 2006) (quotation and citations omitted).

## 2. Analysis

On appeal, Yarbrough asserts the district court erred in concluding the government made a prima facie showing that its minimization efforts were reasonable and, thus, erred in refusing to suppress all evidence the government obtained through its wiretap. In particular, Yarbrough asserts the district court erred when it excluded from its minimization analysis all calls less then two minutes in duration. On appeal from the denial of a motion to suppress evidence obtained pursuant to a wiretap, this court accepts the district court's factual findings unless clearly erroneous, reviews questions of law de novo, and views the evidence in the light most favorable to the government. *United States v. Garcia*, 232 F.3d 1309, 1312 (10th Cir. 2000).

Federal law allows the government to apply for and obtain a wiretap when probable cause exists to believe a defendant is committing, has committed, or is about to commit certain crimes, including the obstruction crimes at issue in this case. 18 U.S.C. §§ 2516(1)(c), 2518(3)(a). Every order approving a wiretap must provide that the wiretap "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." *Id.* § 2518(5). A defendant may move to suppress evidence obtained from the wiretap if the wiretap was not undertaken in conformity with § 2518(5)'s

minimization requirement. *Id.* § 2518(10)(a). It must be emphasized, however, that § 2518(5)

> does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to "minimize" the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.

*Scott v. United States*, 436 U.S. 128, 140 (1978).

In *United States v. Willis*, this court articulated the proper procedure for determining the reasonableness of governmental efforts to avoid monitoring non-pertinent calls. 890 F.2d 1099, 1102 (10th Cir. 1989). The government must make an initial prima facie showing of reasonable minimization. *Id.* "Once the government has made a prima facie showing of reasonable minimization, the burden then shifts to the defendant to show more effective minimization could have taken place." *Id.* In determining whether the government has made a prima facie showing of reasonable efforts to minimize the interception of non-pertinent calls, we consider the factors identified by the Supreme Court in *Scott*: (1) whether a large number of the calls are very short, one-time only, or in guarded or coded language; (2) the breadth of the investigation underlying the need for the wiretap; (3) whether the phone is public or private; and (4) whether the non-minimized calls occurred early in the surveillance. 436 U.S. at 140-41. It is also appropriate to consider (5) the extent to which the authorizing judge supervised

the ongoing wiretap. *United States v. Lopez*, 300 F.3d 46, 57 (1st Cir. 2002); *United States v. Daly*, 535 F.2d 434, 442 (8th Cir. 1976); *United States v. Vento*, 533 F.2d 838, 853 (3d Cir. 1976).

In this case each of the factors set out above favors the conclusion that the government established a prima facie case of reasonable minimization. First, consistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes. *Scott*, 436 U.S. at 140 (noting "agents can hardly be expected to know that [very short] calls are non pertinent prior to their termination"); *Willis*, 890 F.2d at 1102 (excluding from minimization analysis calls which lasted less than two minutes"); *United States v. Apodaca*, 820 F.2d 348, 350 n.3 (10th Cir. 1987) (same); *see also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002).[2] Of the 361 calls monitored, 277 were less than two minutes in length and 218 were less than one minute in length. Thus, we focus on the eighty-four calls that exceeded two minutes in length.

Of those eighty-four calls, six were pertinent and twenty were minimized, meaning that 25.6% of calls subject to minimization were so minimized. Under

---

[2]Yarbrough asserts the district court erred in excluding such calls from its minimization analysis. In light of the language from *Willis*, it is clear the district court correctly read this court's precedents. We further note that at least one Circuit has interpreted our case law for the proposition that calls of "less than [two] minutes do not require minimization." *United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002).

the particular facts of this case, we agree with the district court that this percentage is sufficient to support a conclusion the government made out a prima facie case of reasonable minimization. The government's wiretap was supervised by Chief Judge Eagan on a weekly basis. The wiretap order authorized the investigation of numerous offenses, including conspiracy, drug crimes, obstruction of justice and law enforcement, interstate trafficking in stolen property, gambling, and bribery involving federal funds. In light of the extensive nature of the criminal investigation, the agents were entitled to more leeway in monitoring calls. The wiretap order was directed to Yarbrough's personal cell phone, rather than a public phone or a phone used generally by members of his residence. Non-minimized calls occurred more frequently in the early part of the wiretap, at a time when agents were learning to identify speakers, the speakers' relationships to Yarbrough, and the significance of the conversations.[3]

---

[3]Yarbrough asserts the district court erred in considering an affidavit of Special Agent David Clarke submitted by the government after the conclusion of the evidentiary hearing on the motion to suppress. It is clear, however, that hearsay testimony is admissible at a suppression hearing as long as it bears sufficient indicia of reliability. *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004). Furthermore, even if this court were to assume it was error to admit the affidavit, that error would be harmless. A review of the entire record reveals that the affidavit, considered in context, is directed almost exclusively to the question of whether Yarbrough carried his burden before the district court of demonstrating more effective minimization could have taken place. *See United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir. 1989) (holding that once the government makes a prima facie showing of reasonable minimization, the burden shifts to the defendant to show more effective minimization could have taken place). The only question on appeal, however, is whether the district court erred

(continued...)

For those reasons set out above, we agree with the district court that the United States established a prima facie case of reasonable minimization. Because Yarbrough does not assert on appeal that he carried his burden of demonstrating "more effective minimization could have taken place," *Willis*, 890 F.2d at 1102, this court's analysis is at an end and the district court's order denying suppression must be affirmed.

## B. Entrapment Instruction

At trial, Yarbrough requested that the jury be given an entrapment instruction. The district court denied the request, concluding Yarbrough failed to adduce evidence he was induced to commit the crimes. On appeal, Yarbrough asserts the district court erred in refusing to give the jury his requested entrapment instruction. The district court's conclusion that there was insufficient evidence to support an entrapment defense is reviewed by this court de novo. *United States v. Scull*, 321 F.3d 1270, 1274 (10th Cir. 2003).

The entrapment defense protects a defendant, who is not otherwise predisposed to commit a crime, from governmental coercion. *Id.* at 1275. It places in the hands of the jury the question of whether the criminal intent originated with the defendant or with the government. *Id.*

---

[3](...continued)
in concluding the government met its antecedent burden of establishing a prima facie case.

> A defendant is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment. For the purposes of determining the sufficiency of the evidence to raise the jury issue, the testimony most favorable to the defendant should be accepted. The defendant must show, either by presenting his own evidence or by pointing to evidence presented by the government in its case-in-chief, his lack of predisposition to commit the crime and government involvement and inducement.

*Id.* (quotations and citations omitted). "To obtain an entrapment instruction, a defendant must establish two elements: first, the government agents must have *induced* the defendant to commit the offense; and second, the defendant must not have been otherwise *predisposed* to commit the offense, given the opportunity." *United States v. Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005) (quotation omitted). Because Yarbrough failed to produce sufficient evidence at trial that the government agents induced him to commit the offenses, this court need not address the question of Yarbrough's predisposition to commit the offenses. *United States v. Shinderman*, 515 F.3d 5, 15 n.6 (1st Cir. 2008); *see also United States v. Millet*, 510 F.3d 668, 675-76 (7th Cir. 2007) (holding it was unnecessary to address question of inducement because the evidence showed the defendant was predisposed to commit the crime).

"'Inducement' is government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *Scull*, 321 F.3d at 1275 (quotation omitted). It "can occur through persuasion, fraudulent representations, threats, coercive tactics, harassment,

-13-

promises of reward, or pleas based on need, sympathy or friendship." *Id.*
(quotation omitted). "Simple evidence that a government agent solicited,
requested, or approached the defendant to engage in criminal conduct, standing
alone, is insufficient to constitute inducement. Inducement also will not be
shown by evidence that the government agent initiated the contact with the
defendant or proposed the crime." *Nguyen*, 413 F.3d at 1178 (quotation and
alteration omitted).

In support of his claim that he adduced at trial sufficient evidence of
inducement to warrant an entrapment instruction, Yarbrough simply asserts the
government played upon his long-term friendship with the target of the
investigation. Yarbrough claims the government manufactured a crime by making
available to him information that his friend was subject to a federal investigation
and was the subject of a search and seizure warrant. In our view, this contention
borders on the frivolous.

The government agents in this case did not manufacture a crime but instead
merely provided an opportunity for Yarbrough to engage in criminal conduct.
*Shinderman*, 515 F.3d at 14 ("Improper inducement requires a showing not only
that the government afforded a defendant an opportunity to commit a crime but
also that it brought to bear something more—something akin to excessive
pressure, threats, or the exploitation of an unfair advantage." (quotation omitted));
*United States v. Ramos-Paulino*, 488 F.3d 459, 462 (1st Cir. 2007) ("We

-14-

repeatedly have held that the . . . mere provision of an opportunity to engage in [criminal activity] does not meet the threshold requirement for a finding of wrongful inducement."). There is absolutely no suggestion the government agents used coercive tactics, preyed on economic need, or used hard-sell rhetoric. *See Shinderman*, 515 F.3d at 15. In fact, as Yarbrough recognizes in his brief, government agents never once suggested or discussed the offense with him. That they provided him with access to information indicating his friend was under investigation is simply the kind of "artifice or stealth" courts have consistently held is insufficient to demonstrate wrongful inducement. *See, e.g.*, *Sorrells v. United States*, 287 U.S. 435, 441 (1932) ("It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises."); *Ramos-Paulino*, 488 F.3d at 462; *United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006). Because the record is devoid of evidence of wrongful inducement, the district court correctly determined Yarbrough was not entitled to a jury instruction on entrapment.

## C.  Character Evidence

Yarbrough sought to introduce at trial character evidence of his integrity and status as a law-abiding, trusted police officer, pursuant to Federal Rules of Evidence 404(a)(1) and 405. He asserted evidence of his law-abiding nature was

directly relevant to the charges at issue, which alleged he corruptly impeded and conspired to corruptly imped an investigation, as well as unlawfully and willfully provided notice of the existence of a search and seizure warrant to prevent the execution of such warrant. The district court excluded Yarbrough character witnesses on the ground the proffered evidence went to Yarbrough's "state of mind at a particular incident," rather than to the existence of "operative facts."[4] Yarbrough asserts on appeal that the district court erred in excluding his proffered character witnesses on this basis. The district court's decision to exclude evidence is reviewed for abuse of discretion and will be reversed only if the decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Atencio*, 435 F.3d 1222, 1235 (10th Cir. 2006) (quotation omitted). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

The Federal Rules of Evidence specifically provide that at trial a defendant may adduce "evidence of a pertinent trait of character." Fed. R. Evid. 404(a)(1). The Rules further provide that "proof [of character] may be made by testimony as

---

[4]To be more precise, a review of the trial transcript reveals the district court drew a distinction, for purposes of Rule 404(a)(1), between cases where a defendant sought to introduce character evidence to dispute the existence of a historical fact (i.e., defendant is generally of peaceful character and thus would not have struck the victim) and Yarbrough's situation (i.e., it is undisputed Yarbrough undertook certain actions and all that is disputed is whether he did so with a prohibited mens rea). The district court incorrectly ruled character evidence was admissible in the former situation but not in the latter.

to reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). Taken together, these rules make clear that although propensity evidence is generally not allowed, "when . . . the defendant in a criminal case seeks to offer evidence of his good character to imply that he is unlikely to have committed a crime, the general rule against propensity evidence is not applied." 1 *McCormick on Evidence* § 191 (Kenneth S. Broun, ed., 6th ed. 2006) [hereinafter McCormick].[5]

Despite the plain language set out above, the district court excluded character evidence because the underlying facts were not in dispute and the only issue for the jury was whether Yarbrough acted with a prohibited mind set at the time he undertook those undisputed actions. We cannot discern in Rule 404(a)(1) the distinction announced by the district court. Instead, in a remarkably similar situation, this court has recognized that such evidence is not only relevant, but also vitally important. In *Petersen v. United States*, the defendant was tried and

---

[5]The government's briefing on this issue is somewhat puzzling. The government simply cites to Federal Rule of Evidence 608(a) and asserts that because Yarbrough's character for truthfulness had not been attacked he was not entitled to adduce character evidence at trial. Rule 608 certainly does limit the admission of character evidence *of a witness* to those situations where the *witness's* character has been attacked. Fed. R. Evid. 608(a)(2) ("[E]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."). It does not, however, deal in any way with the issue of the admissibility of evidence *of a defendant's* good character. That issue is covered by Rule 404(a)(1), which specifically provides that evidence of a pertinent character trait of a criminal defendant is generally relevant and admissible at trial.

convicted on two counts of tax evasion. 268 F.2d 87, 87 (10th Cir. 1959). At trial he admitted the underpayment of taxes but denied any wrongful intent. *Id.* at 88. When the defendant indicated his intent to adduce three character witnesses, the district court belittled the use of character witnesses and limited the defendant to one such witness. *Id.* at 88. On appeal, this court noted as follows:

> The rule is well established that "a defendant may offer his good character to evidence the improbability of his doing the act charged." As said in *Michelson v. United States*, 335 U.S. 469[, 476 (1948)], "character is relevant in resolving probabilities of guilt." In a case such as this where the defendant admits understatement of income and defends solely on the lack of wilful intent, the character of the defendant is an important element. In the exercise of a sound judicial discretion a court may limit the number of witnesses permitted to testify to a single fact and the extent to which cumulative testimony may be received. It may be that in some instances, particularly where a fact is not contested, a limitation to one witness is proper. However, to restrict a defendant to one character witness is a harsh limitation in a case such as this where the sole defense is lack of wilful intent.

*Id.* (footnote omitted). Thus, contrary to the conclusion of the district court, *Petersen* makes clear that character evidence is admissible in cases, such as this one, where the sole issue before the jury is whether a defendant undertook his undisputed acts with a prohibited state of mind. *Id.*; *see also United States v. Angelini*, 678 F.2d 380, 381 (1st Cir. 1982) ("Evidence that [the defendant] was a law-abiding person would tend to make it less likely that he would knowingly break the law."); McCormick § 191 ("A few general traits, like being law-abiding, seem relevant to almost any accusation."); Federal Trial Handbook Criminal

-18-

§ 70:2(a) ("Evidence of the defendant's character as a law-abiding citizen is always relevant . . . ."). Because its decision to exclude Yarbrough's character witnesses was based on a legally erroneous reading of Rule 404(a)(1), the district court abused its discretion in excluding the proffered evidence. *Atencio*, 435 F.3d at 1235.

This court's inquiry does not, however, end with that conclusion. Pursuant to the Federal Rules of Criminal Procedure, we must disregard the district court's error unless it affected Yarbrough's substantial rights. Fed. R. Crim. P. 52(a). "In non-constitutional harmless error cases, the government bears the burden of demonstrating, by a preponderance of the evidence, that the substantial rights of the defendant were not affected." *United States v. Marshall*, 432 F.3d 1157, 1162 (10th Cir. 2005) (quotation omitted). The government has not argued, however, that if the district court erred in excluding Yarbrough's proffered character witnesses, the error was harmless. Accordingly, it has failed to carry its burden of demonstrating Yarbrough's substantial rights were not affected by the district court's error. Even if this court were to exercise its discretion to initiate harmless error review sua sponte, *United States v. Holly*, 488 F.3d 1298, 1307-08 (10th Cir. 2007), we would still conclude the error here affected Yarbrough's substantial rights. A review of the entire trial transcript reveals that although Yarbrough's actions were uncontested, his state of mind was highly controverted. In *Petersen*, this court concluded that in such situations, "the character of the defendant is an

-19-

important element." 268 F.2d at 88; *see also Angelini*, 678 F.2d at 382 (1st Cir. 1982) (holding that exclusion of character evidence of defendant's law-abiding nature affected his substantial rights in a prosecution for possession of illegal drugs); *United States v. Hewitt*, 634 F.2d 277, 280 (5th Cir. 1981) (same as to prosecution on charges of receipt or possession of an illegal weapon). Because the district court's error deprived Yarbrough of important evidence relevant to a sharply controverted question going to the heart of Yarbrough's defense, Yarbrough's substantial rights were affected and he is entitled to a new trial.

## IV. Conclusion

The district court properly admitted at trial the government's wiretap evidence and properly refused Yarbrough's request for an entrapment instruction. Because, however, the district court erred in totally excluding Yarbrough's proffered character evidence, and because that error affected Yarbrough's substantial rights, Yarbrough's conviction is hereby **REVERSED** and the matter is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.[6]

---

[6]On June 26, 2007, this court issued an order provisionally sealing the parties' briefs in this case. With the issuance of this opinion we hereby make permanent the order sealing the parties' briefs.